

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-22-00142-CR

CHRISTOPHER WILLIAMS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 272nd District Court
Brazos County, Texas
Trial Court No. 19-01071-CRF-272

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

# MEMORANDUM OPINION

Christopher Williams was convicted by a Brazos County[1] jury of burglary of a habitation with the intent to commit or attempt to commit sexual assault.[2] He was sentenced to life imprisonment.

On appeal, Williams complains that the trial court committed reversible error (1) in admitting extraneous-act evidence under Rule 403 of the Texas Rules of Evidence and (2) in denying Williams's *Batson*[3] challenge. Williams also complains that the evidence was legally insufficient to support a conviction for sexual assault or attempted sexual assault. Because we find (1) no error in the admission of extraneous-offense evidence, (2) that the trial court did not err in overruling Williams's *Batson* challenge, and (3) that the evidence is sufficient to support the jury's verdict, we affirm the trial court's judgment.

## I. Background Facts

Alexandria Fontana, a student at Texas A & M University, testified that, on the night of April 21, 2018, she, her roommates, and several other friends had a party. At the time, Fontana lived in an apartment complex called The Junction. Fontana got back to her apartment around 3:00 a.m. the next morning. She left the back door of her apartment unlocked so one of her friends could get in later that morning.

---

[1]Originally appealed to the Tenth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. We are unaware of any conflict between precedent of the Tenth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

[2]*See* TEX. PENAL CODE ANN. § 30.02(a)(1), § 22.011 (Supp.).

[3]*Batson v. Kentucky*, 476 U.S. 79 (1986).

Fontana was awakened by someone "shuffling through [the] covers" and "grab[bing] [her] vagina." The person put their hand over her mouth. Fontana testified that she believed she was about to be raped and killed. She described her attacker as a Black man wearing only shorts, wearing no shirt, having a shaved head or very closely cut hair, and wearing a blue bandana around his face. Later, after the attacker ran out of the apartment, Fontana noticed some kind of fluid or moisture on her night shirt. That substance was submitted for forensic testing and yielded DNA evidence that could not exclude Williams as the source.[4]

Fontana could not say that Williams ever put his hand in her vagina. However, she said that Williams's hand "was on the outside of [her] underwear," over her vagina, and she had "no doubt that he was trying to get inside of [her] underwear."

Williams was charged with burglary of a habitation with the intent to commit or attempt to commit sexual assault on Fontana. At trial, Williams pled guilty to criminal trespass and offered a defense that he only entered Fontana's room to masturbate.

## II.    The Extraneous-Offense Evidence Was Admissible

In his first point of error, Williams argues that the trial court erred when it admitted testimony from a woman who testified to enduring an incident very similar to that described by Fontana. According to Williams, the probative value of the extraneous-offense evidence was

---

[4]Williams ejaculated on Fontana's shirt. Analysis of the semen established a one in 88.3 nonillion chance that the DNA in the semen was contributed by an African American other than Williams.

3

substantially outweighed by the prejudicial nature of that evidence. *See* TEX. R. EVID. 403.[5] We disagree.

The State presented evidence that, on October 22, 2016, Williams broke into another apartment in The Junction apartment complex and committed a very similar offense against a woman named Katy Nelle. Nelle was also an A & M student at the time. Nelle testified that she was asleep in her bedroom. Around 4:00 a.m. one morning, she was awakened by a man holding her down, and the man's erect penis was touching her face. She described the assailant as a Black man in shorts or boxers, no shoes, and no hair. DNA evidence established that the man was Williams.[6] He was masturbating, and Nelle believed he was trying to put his penis into her mouth. She was able to fight him off, and he ran out the front door of the apartment.

### A.    Standard of Review

When conducting a Rule 403 balancing test, the court

> must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

---

[5]The title of Williams's point of error claims error in the trial court's admission of "extraneous act evidence . . . admitted under Rule 404(b) of the Texas Rules of Evidence." Even so, his briefing only addresses Rule 403 and claims that the trial court should have excluded Nelle's testimony based on that rule.

[6]DNA analysis of fluid on Nelle's bedding could not exclude Williams as a contributor. That report was admitted by stipulation of the parties and read to the jury. The sperm in this DNA sample was "interpreted as a mixture of two individuals" with the "probability of this profile" coming from Williams and "one unknown individual [being] 335 octillion times greater than the probability of this profile if the DNA came from two unrelated, unknown individuals."

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). In any given case, "these factors may well blend together in practice." *Id.* at 642.

"Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial." *Magee v. State*, 994 S.W.2d 878, 887 (Tex. App.—Waco 1999, pet. ref'd) (citing *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1988) (op. on reh'g)). "[O]nly if the danger of unfair prejudice substantially outweigh[s] the probative value" of the evidence will we find that the trial court abused its discretion in admitting the evidence. *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002).

### B. Analysis

#### 1. Probative Force and State's Need for Nelle's Assault Evidence.

Although DNA evidence proved that Williams was in Fontana's bedroom and ejaculated on her shirt, the State needed evidence of Nelle's assault to help prove that Williams committed or attempted to commit sexual assault. Williams only pled guilty to criminal trespass. Williams's defensive theory was that, while he broke into Fontana's apartment, he only did so to masturbate in front of her. Williams told the jury during his opening statement that there was insufficient evidence to prove that he committed or attempted to commit sexual assault. Thus, Nelle's testimony, that Williams tried to put his penis into her mouth while masturbating, was probative of the State's theory that Williams was in Fontana's room to commit or attempt to commit sexual assault. The State also needed evidence of Nelle's assault to rebut Williams's defensive theory. *See Powell v. State*, 63 S.W.3d 435, 438–40 (Tex. Crim. App. 2001) (defendant's opening statement, that he lacked the opportunity to molest the complainant under

5

the circumstances of the charged offense, opened the door to admission of extraneous-offense evidence that the defendant molested others under almost identical circumstances to rebut defendant's lack of opportunity defensive theory); *see also Daggett v. State*, 187 S.W.3d 444, 453–54 (Tex. Crim. App. 2005) (defendant's testimony disavowing any sexual misconduct with minors opened the door to the admission of extraneous-offense evidence of defendant's sexual misconduct with another minor to rebut defendant's testimony).

These factors weigh in favor of admission.

### 2. Any Tendency to Suggest a Decision on an Improper Basis or to Confuse or Distract the Jury from the Main Issues at Trial.

We find no tendency for the evidence of Nelle's assault to suggest that the jury convicted Williams because of that offense or that the jury was confused or distracted from the conduct on trial. As discussed below, the State did not spend an inordinate amount of time proving up Nelle's assault. Before Nelle testified, the trial court instructed the jury that it was about to hear testimony about an extraneous bad act and that the testimony was only to be considered "for the limited purpose of showing motive, intent, the defendant's knowledge, or to rebut a defensive theory in connection with the offense alleged." The trial court further instructed the jury that it could only consider Nelle's testimony if the jury found "beyond a reasonable doubt that [Williams] committed th[o]se acts." The trial court also instructed the jury that Nelle's testimony was not to be "considered to prove the character of [Williams] in order to show [he] acted in conformity with [his] character." Finally, the trial court's charge instructed the jury that the evidence of Nelle's assault was admitted only for limited purposes "of showing the defendant's motive, intent, the defendant's knowledge, or to rebut any defensive theory in

6

connection with the offense alleged in the indictment in this case and for no other purpose." It is presumed that the jury followed the trial court's instructions. *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009).

These factors weigh in favor of admission.

### 3.  Time Spent Proving Extraneous Offense is Repetitive of Other Evidence Already Admitted.

We compare the amount of time, measured by pages in the record of direct examination testimony, to prove Nelle's assault and the charged offense against Fontana:

| Fontana's assault | Nelle's assault |
|---|---|
| Twenty-five pages of testimony by Fontana | Thirteen pages of testimony by Nelle |
| Thirty-four pages of testimony from law enforcement describing gathering evidence at the scene and their investigation | Thirteen pages of testimony from law enforcement describing gathering evidence at the scene and their investigation |
| Twenty-one pages of testimony by forensic investigator establishing that Williams's DNA was on Fontana's shirt after she reported the break-in | One page of narration by the State where stipulation of evidence entered that Williams's DNA was found on Nelle's bedding (laboratory reports admitted as exhibits of evidence)[7] |
| Three pages of testimony establishing Williams's cell phone went toward College Station in the hours before the assault then away from College Station following the assault | Three pages of testimony establishing Williams's cell phone went toward College Station in the hours before the assault then away from College Station following the assault[8] |

---

[7]After reading about a page of the laboratory report from the Nelle offense, the State, with the approval of Williams's attorney and the trial court, told the court reporter that she did not need to transcribe his reading as the report would be in evidence for the jury's consideration. The reports relating to the Nelle offense were five pages long.

[8]Detective Jared Cleere with the College Station Police Department, discussed below, testified to his acquisition and review of Williams's cell phone records for both offense dates. For this comparison, we only included pages of testimony specific to the two offenses. We have not counted the pages of Cleere's preliminary testimony regarding his training, experience, and method of acquiring and reviewing data.

We find that the time spent proving Nelle's assault was not unduly lengthy. Nor was it cumulative of other evidence. These factors weigh in favor of admission.

In consideration of these factors, we find no "clear disparity between the degree of prejudice of the offered evidence and its probative value." *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (quoting *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001)). The trial court was within its discretion to admit evidence about Nelle's assault under Rule 403. As a result, we overrule this point of error.

## III. The Trial Court Did Not Err in Overruling Williams's *Batson* Claim

Next, Williams argues that the trial court erred when it denied his *Batson* claim. After voir dire, Williams objected that the State used three of its peremptory strikes against African American women. The State presented race-neutral explanations for its strikes, and the trial court denied Williams's claim.

### A. Standard of Review

Use of peremptory challenges to strike potential jurors on the basis of race is prohibited by both the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article 35.261 of the Texas Code of Criminal Procedure. U.S. CONST. amend. XIV, § 1; *see Batson*, 476 U.S. at 85–86; TEX. CODE CRIM. PROC. ANN. art. 35.261. If the defendant suspects the State of making race-based challenges, he may request a *Batson* hearing. *See* TEX. CODE CRIM. PROC. ANN. art. 35.261(a).

Courts use a three-step process in determining *Batson* challenges. *Snyder v. Louisiana*, 552 U.S. 472, 476–77 (2008); *Young v. State*, 283 S.W.3d 854, 866 (Tex. Crim. App. 2009)

8

(per curiam).  Initially, the defendant must present a prima facie case that the State exercised its peremptory challenges on the basis of race.  *Snyder*, 552 U.S. at 476; *Young*, 283 S.W.3d at 866.  The State must then articulate a race-neutral explanation for its challenged strikes.  *Snyder*, 552 U.S. at 476–77; *Young*, 283 S.W.3d at 866.  A race-neutral explanation is one "based on something other than the race of the juror."  *Hernandez v. New York*, 500 U.S. 352, 360 (1991).  If no "discriminatory intent is inherent in the . . . explanation, the reason [is] deemed race neutral."  *Id.*  The defendant may rebut the State's explanation, but the burden of proving purposeful discrimination remains with the defendant.  *Young*, 283 S.W.3d at 866.  In the final step, "the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination."  *Hernandez*, 500 U.S. at 360; *Young*, 283 S.W.3d at 866; *see Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam).

In reviewing a *Batson* ruling, we consider the record "in the light most favorable to the trial court's ruling."  *Young*, 283 S.W.3d at 866.  The trial court's decision will not be disturbed "unless it is clearly erroneous."  *Young*, 283 S.W.3d at 866; *Jackson v. State*, 442 S.W.3d 771, 774 (Tex. App.—Texarkana 2014, no pet.); *see Hernandez*, 500 U.S. at 369.  To determine whether the trial court's decision was clearly erroneous, we examine the record to see whether we are left with a "definite and firm conviction that a mistake has been committed."  *Guzman v. State*, 85 S.W.3d 242, 254 (Tex. Crim. App. 2002) (quoting *United States v. Fernandez*, 887 F.2d 564, 567 (5th Cir. 1989) (per curiam)).  The trial court is in the best position to determine whether the State's race-neutral explanation is genuine, so we defer to its ruling barring exceptional circumstances.  *Nieto v. State*, 365 S.W.3d 673, 676 (Tex. Crim. App. 2012).  The

trial court "must focus on the genuineness of the asserted non-racial motive, rather than the reasonableness." *Jackson*, 442 S.W.3d at 774 (quoting *Nieto*, 365 S.W.3d at 676). In our review, we "consider the entire record of the voir dire," and we are not limited "to the specific arguments brought forth to the trial court by the parties." *Nieto*, 365 S.W.3d at 676 (citing *Watkins v. State*, 245 S.W.3d 444, 448 (Tex. Crim. App. 2008)).

We do not substitute our judgment for the trial court's when considering whether the State's explanation was a pretext. *Id.* Like the trial court, we consider the genuineness, not the reasonableness, of the proffered non-racial explanation. *Id.* (citing *Gibson v. State*, 144 S.W.3d 530, 533–34 (Tex. Crim. App. 2004)). "Whether the opponent satisfies his burden of persuasion to show that the proponent's facially race-neutral explanation for his strike is pre-textual, not genuine, is a question of fact for the trial court to resolve in the first instance." *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008).

## B.    The *Batson* Hearing

Before voir dire, potential jury members completed two questionnaires. On the second questionnaire, question eleven and its possible answers read as follows:

How much do you blame the owner of a car that is burglarized, but was left unlocked?

A.    [T]otally responsible for the burglary
B.    Somewhat responsible for the burglary,
C.    Not responsible for the burglary at all

After voir dire and the parties exercised their peremptory strikes, Williams objected that the State violated *Batson* in striking three African American female veniremembers. The State responded that it "struck every single juror that said they would hold the person burglarized totally

10

responsible for the burglary," i.e., selected answer "A" on question eleven. The State acknowledged that those struck venirepersons included three African American women. The State explained,

> A central issue of this case will be that all the burglary victims, especially our burglary victim in this case, had left her door unlocked. So it was our intention to strike any and all jurors who would blame the victim or make them responsible for the burglary of their vehicle and by analogy could create or would hold responsible our victim in this case. We struck every juror remaining that answered the question from No. 11 as (A), totally responsible for the burglary.

The State then listed the three prospective jurors complained of by Williams and one other juror who was not African American. The State also pointed out that one of the struck African American women, "Juror 53," had engaged with one of the State's attorneys during voir dire. The prosecutor told a personal story about how she would on occasion leave her car unlocked, and it would frustrate her husband. She then asked the jury panel a question regarding her responsibility for having her car's contents stolen if she had left the car unlocked. Juror 53 answered that the prosecutor would be responsible: "I know it's on your property. But they tell you all the time on the news, commonsense, we have to tell you to lock your car and you won't leave stuff in your car."[9]

Williams replied that he believed the State's reasons were pretextual and that the State's strikes were racially motivated. He argued that the question, whether prospective jurors would hold responsible the car owner who left their vehicle unlocked, was inapposite to the charges at

_____

[9]In his brief, Williams compares Juror 53's statement with that made by another venireperson that the prosecutor was "stupid" for leaving her car unlocked. Williams claims this "strident" comment by a venireperson the State did not strike called into question the genuineness of the State's race-neutral explanation. The venireperson at issue did not answer "A" to question eleven. Also, Williams did not make this argument to the trial court. Williams makes similar arguments in his appellate brief regarding other venirepersons, which he did not present to the trial court. We decline to address these arguments that were not made to the trial court.

bar: "This is not a burglary of a vehicle case. It's a burglary of a habitation case. And they're trying to use the vehicle -- somebody leaving their car unlocked which is totality [sic] different than a habitation -- as a pretext." Williams pointed out that he was African American and that the complainant, Fontana, as well as the extraneous-offense witness Nelle, were Caucasian. "We're going to have an all-white jury."

After the State made its race-neutral reasons for its strikes, the burden shifted to Williams to rebut the State's stated reasons. *See Williams v. State*, 804 S.W.2d 95, 101 (Tex. Crim. App. 1991). Williams "did not cross-examine the prosecutor or attempt to impeach the prosecutor through other evidence such as a comparison analysis of the peremptorily challenged white and black venirepersons." *Whitsey v. State*, 796 S.W.2d 707, 723 (Tex. Crim. App. 1989) (op. on reh'g).[10] He offered no substantive argument or rebuttal other than the above-quoted statement about having "an all-white jury" on a "racially sensitive case."

The trial court found the State's reasons to be race neutral and denied Williams's *Batson* challenge.

### C. Analysis

As explained above, we can only reverse the trial court's *Batson* ruling if we find the ruling clearly erroneous.

> In assaying the record for clear error, the reviewing court should consider the entire record of voir dire; it need not limit itself to arguments or considerations

---

[10]Williams offered an initial rebuttal that he "believe[d] that there were more than just those individuals named by the State who said they would attribute some blame, all or some, [to] the individual who left the car unlocked would be blameworthy." The trial court pointed out that the State said they struck all who would hold the vehicle owner "totality [sic] responsible" by indicating choice "A." Williams then said he did not have all questionnaires "in front of [him]." He did not pursue that line of rebuttal and then made his broad claim that the State's reasons were pretextual.

that the parties specifically called to the trial court's attention so long as those arguments or considerations are manifestly grounded in the appellate record. But a reviewing court should examine a trial court's conclusion that a racially neutral explanation is genuine, not a pretext, with great deference, reversing only when that conclusion is, in view of the record as a whole, clearly erroneous.

*Blackman v. State*, 414 S.W.3d 757, 765 (Tex. Crim. App. 2013) (footnote omitted) (citation omitted). Factors to consider may include: "(1) statistical evidence; (2) evidence of disparate questioning of similarly-situated venirepersons, (3) side-by-side comparisons of the stricken venirepersons and the accepted venirepersons, (4) whether the record supports the State's explanations for its strikes, and (5) any other relevant circumstances bearing on the issue of purposeful discrimination." *Compton v. State*, 666 S.W.3d 685, 698 (Tex. Crim. App. 2023) (citing *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019)).

The parties agree that the venirewomen at issue were the only three African Americans in the strike zone. Hence, statistically, all possible members of Williams's race were struck by the State.[11] However there is no evidence of any disparate questioning by the State of any of these women. Nor is there disparity in comparing struck versus accepted venirepersons.[12] The record supports the State's race-neutral reasons presented to the trial court. All persons who answered question eleven with "A" were struck by the State.

---

[11]Four African Americans were struck for cause.

[12]The State directs us to *Adair v. State*, 336 S.W.3d 680 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd), as authority that, "[w]here the basis for the comparison is not in evidence or presented to the trial court, either at the voir dire or at the subsequent *Batson* hearing, an appellate court may not consider it in evaluating the *Batson* claim." *Id.* at 689 (citing *Cornish v. State*, 848 S.W.2d 144, 145 (Tex. Crim. App. 1993); *Vargas v. State*, 838 S.W.2d 552, 557 (Tex. Crim. App. 1992)). Williams spends much of his appellate brief analyzing racial identifications on juror information cards and making arguments that he did not make to the trial court. Our decision only takes into consideration the juror questionnaires that were clearly considered and discussed by the parties and the trial court.

The trial court's ruling on Williams's *Batson* claim was not clearly erroneous. As a result, we overrule the second point of error.[13]

## IV. The Jury's Verdict Is Supported by Legally Sufficient Evidence

In his third point of error, Williams claims that the evidence is insufficient to support the jury's verdict. We disagree.

### A. Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.)). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* at 298 (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets

---

[13]In his brief, Williams also makes general claims that the State's proffered race-neutral arguments were pretextual. *See Snyder*, 552 U.S. 472. That said, he presents no argument or authority on this point. As a result, we do not address it.

14

out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

"In our review, we consider 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Id.* at 297 (quoting *Hooper*, 214 S.W.3d at 13). "It is not required that each fact 'point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13). "Further, 'we must consider all of the evidence admitted at trial, even if that evidence was improperly admitted.'" *Id.* (quoting *Fowler v. State*, 517 S.W.3d 167, 176 (Tex. App.—Texarkana 2017), *rev'd in part by* 544 S.W.3d 844 (Tex. Crim. App. 2018)).

The jury, as "the sole judge of the credibility of the witnesses and the weight to be given their testimony[, could] 'believe all of [the] witnesses' testimony, portions of it, or none of it.'" *Id.* (second alteration in original) (quoting *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014)). "We give 'almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility.'" *Id.* (quoting *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008)). "We may not re-weigh the evidence or substitute our judgment for that of

15

the fact[-]finder." *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018) (citing *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)). "The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence." *Id.* at 733 (quoting *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017)). "Although juries may not speculate about the meaning of facts or evidence, juries are permitted to draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial." *Id.* (citing *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016)).

### B.   Analysis

The State had to prove beyond a reasonable doubt that Williams (1) entered Fontana's apartment (2) without her consent and (3) with the intent to commit sexual assault or, in fact, attempted to commit sexual assault. TEX. PENAL CODE ANN. §§ 30.02(a), 22.011. "Intent may . . . be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

Fontana described an intruder in her bedroom, holding her down, putting his hand over her underwear, and trying to reach her vagina. DNA evidence established Williams as the source of the semen found on Fontana's night shirt. Although Fontana described Williams's hand over her underwear and did not testify that he touched or penetrated her vagina, she testified that she had "no doubt that he was trying to get inside of [her] underwear." The jury could have inferred from Williams's conduct that he was attempting to touch or penetrate Fontana's genitals.

16

In *Walker v. State*, the complainant described Walker "grabbing her legs and pantyhose while dragging her into a nearby alley," and he "touched her in a 'personal place' when he grabbed her dress." *Walker v. State*, 859 S.W.2d 566, 569 (Tex. App.—Waco 1993, pet. ref'd). The Waco Court of Appeals found this evidence sufficient to support the jury's verdict of attempted sexual assault. *Id.*

Extraneous-offense evidence was properly admitted showing that Williams committed a very similar assault against Nelle in the same apartment complex two years before the Fontana offense.[14] Nelle described Williams masturbating over or in front of her and testified that she was certain Williams was trying to put his erect penis into her mouth, i.e., attempting to commit sexual assault of her. The similarity of Nelle's assault and Fontana's assault supports the State's theory that, in Fontana's bedroom, Williams intended to commit sexual assault.

Based on the cumulative evidence, a rational jury could have found that, in addition to trespassing in Fontana's bedroom and masturbating over her, Williams did so in an attempt or with the intent to sexually assault her. As a result, the evidence is sufficient to support the jury's verdict. We, therefore, overrule Williams's third point of error.

---

[14]Williams was also shown to be the perpetrator of the assault on Nelle. DNA evidence established that Williams was the contributor of biological evidence found at the scene of that crime. *See supra* note 6.

17

## V. Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Chief Justice

Date Submitted:    May 26, 2023
Date Decided:    July 14, 2023

Do Not Publish